UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BRENDA DAVIS and DAVID ROY, | Case No: C 08-04481 SBA |
| Plaintiffs, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al., | Dkt. 86 |
| Defendants. | |

In this action, Plaintiffs Dr. Brenda Davis and Dr. David Roy bring claims against Defendants California Department of Corrections and Rehabilitation ("CDCR"), Dr. David Mandel, and Dr. Timothy McCarthy for, inter alia, gender discrimination, sexual harassment, and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. The parties are presently before the Court on Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication. Dkt. 86. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS IN PART and DENIES IN PART the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

I. **BACKGROUND**

A. FACTUAL BACKGROUND

1. **Plaintiffs' Employment Histories with Pelican Bay State Prison**

Plaintiff Dr. Brenda Davis ("Davis") worked, on a contract basis, as a social worker for the CDCR at the Pelican Bay State Prison ("Pelican Bay") and other CDCR facilities, from July 31, 2000 to December 31, 2007. Dkt. 123, Davis Decl. ¶¶ 88-89.

Plaintiff Dr. David Roy ("Roy") also worked as a social worker for the CDCR at Pelican Bay, as a state civil service employee, from 1998 until his retirement on February 16, 2006.  Dkt. 87, Chen Decl., Ex. E (Roy Dep. Tr.) at 45:12-13; 54:19-22.  Roy met Davis in 2000, and they "evolved into a relationship and have been together ever since."  Dkt. 124, Roy Decl. ¶ 2.  On February 17, 2007, Roy returned to work at Pelican Bay as a contractor.  Id. at 46:11-17.

On a date not specified in the submitted evidence, Davis and Roy formed their own contracting company, Apex Clinical Providers.  Dkt. 87, Chen Decl., Ex. A (Davis Dep. Tr.) at 35:3-19; Ex. E at 9:20-10:11.  Again at a time not specified, Plaintiffs' contract work was provided through their contracting company.  Dkt. 90, McLean Decl. ¶ 3.

On September 28, 2007, Davis, Roy, and one other applicant, Vincent Cappello, interviewed for one full time position of Psychiatric Social Worker Supervisor.  Id., Ex. F at 1.  The interview panel consisted of Dr. David Archambault and two other individuals.  Id.  The panel unanimously chose Cappello for the position.  Id.

Separately, around September 2007, Roy was interviewed and selected for a civil service position at Pelican Bay.  Id. at ¶ 6.  His start date was October 2, 2007.  Id.  On November 2, 2007, Roy returned his first paycheck to the personnel office due to a misunderstanding regarding his salary.  Id.  He asked the personnel office to retroactively void his hiring to enable him to be paid as a contractor for the services he rendered during October 2007.  Id.  It is not clear from the record whether that request was honored.

On December 20, 2007, Defendants notified Davis and Roy that they were terminated as of December 31, 2007.  Chen Decl., Ex. A at 248:19-22; Ex. E at 98:10-13.  Roy testified that between February 2006 and December 31, 2007, Dr. Mandel and "various staff" warned him that contractor's work was going to be minimized and civil service work was going to be increased.  Id., Ex. E at 63:14-64:20.  Maureen McLean, the Healthcare Manager at Pelican Bay in 2007, testified that since a federal receivership was established over CDCR's statewide health care system on February 14, 2006, "a number one priority has been the recruitment and hiring of civil service positions."  McLean Decl. ¶ 8.  She further testified that "[a]fter the

implementation of the federal receiver's changes, we were instructed that we were to minimize and eventually eliminate our hiring of contractors." Id. ¶ 9.[1]

### 2. Davis's Allegations Regarding Sexual Harassment and Gender Discrimination

#### a) *The Conduct at Issue*

Davis alleges that she experienced a hostile work environment at Pelican Bay since she arrived on July 31, 2000. Davis Decl. ¶ 4. Davis was assigned to the Enhanced Outpatient Unit ("EOP"). Id. ¶ 7. Dr. David Mandel, who would later become Davis's supervisor, told her "on that first day that as a woman he did not think [she] had what it took 'to get the job done.'" Id. ¶ 5. Mandel told Davis that women were not suited to work at Pelican Bay. Id. ¶ 6. Davis testified that, in a separate incident in 2003, Mandel called her and a female colleague "hebephrenics," which Davis understood to mean hysterical, giggly, and ridiculous. Dkt. 122, Goldman Decl., Ex. C (Davis Dep. Tr.) at 58:7-59:15.

Davis claims that, in August-September 2000, one of her colleagues, Dr. Todd Roy, would "stand outside the EOP staff bathroom observing how long [Davis] was in the bathroom." Davis Decl. ¶ 8. When she got out of the bathroom, Roy would tell her how long it had been. Id. Davis alleges that this conduct by Roy "was a near-daily occurrence, and caused me embarrassment and humiliation." Id. In response, Davis complained about Roy's action and behavior to her supervisor, Archambault, "many times." Id. ¶ 9. Davis alleges that "[n]othing apparent was done to change Dr. Todd Roy's inappropriate behaviors." Id.

Davis then wrote a confidential complaint about Roy to the Pelican Bay administration. Id. ¶ 10. Davis alleges that, "[s]uddenly, after my written complaint, I was viewed by others in my unit as a 'problem.'" Id. One day, when Davis was in the bathroom, Roy banged on the door telling her how long she had been in there. Id. ¶ 11. Davis "called out that [she] was okay." Id. Davis asserts that "I had been on my cycle, having bled on my undergarments and

---

[1] Plaintiffs object to the McLean testimony cited herein on the grounds that it is conclusory and lacking in foundation. Dkt. 121 at 3-4. This objection is OVERRULED, as McLean is offering testimony based on her own personal knowledge as the Healthcare Manager at Pelican Bay.

1  pants.  I had to wash the undergarments and pants.  I had hoped to walk out unnoticed, but this

2  was not possible because of Dr. Todd Roy's hostile persistence."  Id.  When she came out of

3  the bathroom, "Dr. Todd Roy was tapping his watch for all to see."  Id.  She reported the

4  incident to Archambault, "who did nothing."  Id.

5      Davis further alleges that when she arrived at Pelican Bay in 2000, and "for years after,"

6  the inmates "were allowed by prison staff to openly masturbate in groups."  Id. ¶ 12.  Davis

7  "was very firm with [her] inmate patients that this was not acceptable behavior."  Id.  Davis

8  alleges that the Pelican Bay health care management did not support her in setting limits in this

9  area, exposing her to regular scenes of male inmates masturbating.  Id. ¶ 13.  When she brought

10  this up to Mental Health and custodial management, she was asked by Captain Wheeler, with

11  Archambault present, what she "was wearing, saying, or doing that would make the inmate

12  patients do this."  Id. ¶ 14.  During approximately 2000 or 2001, an inmate, Mr. R., "stalked

13  [Davis] down the halls."  Id. ¶ 15.  She complained about this to the administration, including

14  Archambault, and to custodial staff, but "nothing was done and the stalking was allowed to

15  continue for months."  Id.

16      During this time, Davis "was instructed by her supervisor, Dr. Archambault, to sit in a

17  room with Mr. R. and interview him."  Id. ¶ 16.  Davis alleges that "Mr. R. masturbated in

18  front of me until he was satisfied."  Id.  When she "wrote this up, [she] was told by Custody

19  Captain Wheeler that [she] was overreacting."  Id.  Pelican Bay Custody Management "told

20  [her] that [she] was in a men's prison and what did [she] expect."  Id.  Davis asserts that "[t]his

21  conduct was allowed to continue in my presence for several years …."  Id. ¶ 17.

22      Starting in approximately 2004, Mandel, Davis's then-supervisor, "made it known to

23  [her] he was specifically interested in the length and arousal level of the penises of Black

24  inmates."  Id. ¶ 22.  One instance involved an inmate patient, Mr. XYZ.  Id.  "Dr. Mandel

25  continually questioned [Davis's] motives for wanting Mr. XYZ to be moved to the EOP level

26  of care."  Id. ¶ 23.  Davis alleges that, "[o]n one day, Dr. Mandel confronted me about Mr.

27  XYZ.  Dr. Mandel was particularly interested whether Mr. XYZ, who had exposed himself to

28  me, (and who was also horribly decompensated when he exposed himself to me) had pulled his

penis out of his pants so that I could see it, or if Mr. XYZ had just rubbed his penis." Id. ¶ 24.[2] Davis alleges that "Mandel screamed at me repeatedly while he was questioning my motives for recommending that Mr. XYZ move to EOP." Id. She also asserts that "Dr. Mandel grilled [her] about the details of Mr. XYZ exposing his penis, the therapy provided, and questioned the decomposition of the inmate." Id. Davis states that she "left the room and went into the bathroom to vomit." Id. When she came out of the bathroom, "Dr. Mandel was still waiting for [her]. Dr. Mandel grabbed [her] and physically shook [her]." Id. ¶ 25. In his declaration in support of Defendants' motion, Mandel asserts that "[a]t no time did I ever grab or shake Brenda Davis and at no time did she ever tell me that I had grabbed or shaken her." Dkt. 93, Mandel Decl. ¶ 3.

Next, Davis explains: "I then went back to my desk, where I shared an office with Correctional Officer Jeff Sample. C.O. Sample requested an RN come and take my vitals because I was so upset." Davis Decl. ¶ 26. Davis asserts: "When I calmed enough, I went and told Dr. Ted Ruggles, Chief of Psychology, about Dr. Mandel's sexual hostility and the entire event that had just occurred: Mr. XYZ's penis, the grabbing and shaking. I protested Dr. Mandel's sexual hostility and asked Dr. Ruggles to make it stop." Id. ¶ 27.

Furthermore, Davis asserts that "[d]uring the time Dr. Mandel was my supervisor, from 2004 to 2007, he often came to my office when no one else was there." Id. ¶ 28. Defendant states "[h]e would shut the door and loudly berate me, chastise and humiliate me." Id. Davis asserts that she "feared being alone with Dr. Mandel." Id. ¶ 29. According to Davis, "Dr. Mandel usually came into my room on a Friday (because my peer was off). Each time, he would berate me, undermine me, and scream at me." Id. ¶ 30. Davis describes these occasions as follows:

> … Dr. Mandel would sit back in a chair, pull it close to my personal space, lean back, place his hands behind his head and let it rip. He would talk about my personal flaws, as he saw them, (nothing professional). He would tell me jokes about how his wife made more money than he did, but he was going to strap a mattress to her back; presumably to make money by her having sex with others.

---

[2] Plaintiffs do not explain the meaning of "decompensated" in this context.

> Dr. Mandel would often make reference to eroticism, making coy comments.  He
> would tell me how I was not working hard enough.

Id. ¶ 34.  Davis also alleges that, many times, Mandel called her "Teresa," which is his wife's

name.  Id. ¶ 36.

> Additionally, Davis alleges that:

> Dr. Mandel often questioned me at length about whether an inmate's penis was
> or was not erect when the inmate was masturbating in my presence.  At one
> point, I had one inmate who masturbated himself while I was trying to assess
> whether he had a mental illness, following a disciplinary event where the inmate
> had masturbated in front of another female staff.  On this occasion, the officer
> "investigating" the issue kept asking me about if he was erect or not erect, if he
> ejaculated and if his penis was inside or outside the jumpsuit.  When I reported
> this event to the Mental Health IDTT, Dr. Mandel again put me through the
> humiliation of repeating the same information I had answered for the officer.

Id. ¶ 38.

Davis asserts "I was also treated differently than the males in my work area by Dr.

Mandel.  I was told by him to do more, I was picked on more, I was singled out of the crowd,

and I did more work.  I was pulled out by him to be berated in the office alone routinely."  Id. ¶

41.  Moreover, Davis states that, on "approximately April 19, 2007, I walked into work with

Dr. Mandel screaming at me about the defective Medical computer system.  He demanded I

move my office computer back to the old office space, because he wanted more room. This

meant I did not have my computer at my work space.  This did not happen to male co-workers

in the office."  Id. ¶ 43.

Additionally, Davis alleges that, on "approximately July 6, 2007, Dr. Mandel was asked

by me for assistance with an inmate who had gained my first, middle initial and last name, and

had sent eight graphic letters about how the inmate wanted to anally rape me with foreign

objects, and to rub salt in my wounds.  Dr. Mandel refused to assist me and made me return to

personally interview this inmate twice."  Id. ¶ 44.

Davis testified that, in October 2007, Mandel pulled her into her office, closed the door,

and "described this story about how his wife had been dreaming that he, Dr. Mandel, and I had

been having sex with each other and how distressing this was to her.  And he thought this was

really funny."  Goldman Decl., Ex. C at 116:19-25.

In response, Mandel states in his declaration that at "no time did Davis or Roy ever complain to me that I was behaving in a discriminatory or sexual manner with Davis."  Mandel Decl. ¶ 3.

### b)   Davis's Reporting Activities

Davis alleges that in June 2007, she attended a meeting along with Roy and Dr. Timothy McCarthy, the Chief of Mental Health at Pelican Bay, among others.  Davis Decl. ¶ 46.  The group "discussed serious problems with patient care and Dr. Mandel's part in impeding appropriate patient care."  Id.  On August 23, 2007, Davis attended a second meeting with Roy, McCarthy, and others, and they "discussed Dr. Mandel's sexual hostility, harassment and abuse, as well as systemic issues and Dr. Mandel's actions that made for faulty patient care."  Id. ¶ 47.  On September 6, 2007, Davis had a third and final meeting with Roy, McCarthy, and others.  Id. ¶ 48.  At that meeting, "Dr. Mandel's creation of a sexually hostile environment, sexual harassment and abuses were discussed, as well as dangerous inmate/patient care issues."  Id.  Also at that meeting, McCarthy "stated that he did not want me and my colleagues to take our concerns outside his Department, or to put them in writing. He also made it known he no longer supported anyone putting Dr. Mandel's competency in question by verbalizing our inmate patient concerns.  Dr. McCarthy made it clear we were never to break the 'Code of Silence' by going outside of his department to anyone, about the sexual hostility/harassment issues or the patient care issues."  Id. ¶ 49.

Furthermore, Davis asserts that, on September 23, 2007, "Dr. Mandel harassed me with disgusting remarks about unhygienic foreskins."  Id. ¶ 50.  Davis further alleges that on September 27, 2007, "Dr. Mandel verbally harassed me for the final time."  Id. ¶ 50.  Davis then requested another supervisor.  Id. ¶ 51.  Davis also talked with McCarthy and Terri Canada, the Pelican Bay employment relations officer, and submitted documentation to the CDCR Equal Employment Office.  Id.  Davis states "I received telephone calls from Dr. McCarthy, Terri Canada and Margaret Sharp on September 27, 2007.  I advised each of them that I had been subjected to a hostile environment and harassed for nearly four years by Dr.

1    Mandel."  Id.  Roy alleges he joined Davis in September 2007 in reporting the allegedly hostile
2    and harassing conduct against Davis.  Roy Decl. ¶ 23.

3         On October 2, 2007, Archambault advised Davis that Dr. J. Moulton would be her
4    supervisor.  Davis Decl. ¶ 52.  According to Davis, "Archambault told me that he was a good
5    friend of Dr. Mandel and that I would not be at PBSP long."  Id.

6         On December 20, 2007, McCarthy told Davis and Roy that their services would not be
7    needed after the end of the pay period.  Id. ¶ 59.  Davis alleges that when she questioned
8    McCarthy of the sudden timing "he stood up and raised his voice stating: 'Girl, I don't answer
9    to you.'"  Id.

10             **3.    Plaintiffs' Retaliation Allegations**

11        Plaintiffs allege that they were retaliated against in two respects.  First, they assert that
12   they were passed over in favor of a lesser qualified male social worker, Cappello, for the
13   position of Psychiatric Social Worker Supervisor, as a result of Davis's September 27, 2010
14   complaint against Mandel.  Goldman Decl., Ex. C at 178:3-179:4.  On this issue, Roy testified
15   that he understood Mandel to be "best friends" with Archambault, who was one of the three
16   members of the interview panel.  Chen Decl., Ex. E at 100:3-11.  Moreover, Davis testified that
17   she believed Cappello to be lesser qualified because he "had been in Corrections for many
18   fewer years and had less years of administrative work."  Goldman Decl., Ex. C at 179:3-4.
19   Likewise, Roy asserts that Cappello was not as qualified because he held a masters degree, in
20   contrast to Plaintiffs' doctoral degrees.  Roy Decl. ¶ 27.  Roy also contends that Cappello had
21   less training than Plaintiffs with respect to an electronic medical records system used at Pelican
22   Bay.  Id. ¶ 28.

McLean, the Healthcare Manager at Pelican Bay in 2007, approved Cappello's appointment.  McLean Decl. ¶ 14.[3]  She submitted declaration testimony indicating that the panel unanimously chose Cappello because he "was the superior candidate for the job due to his excellent responses to interview questions, extensive experience and outstanding references."  Id.  McLean also submitted an October 3, 2007 "approval to appoint document," in which the interview panel sets forth similar reasons for recommending Cappello.  Id., Ex. F.

On a date unspecified in the record, Plaintiffs requested an administrative review of the hiring of Cappello, on the ground that "the hiring panel was biased."  Id. ¶ 15; Ex. G at 3.[4]  The Equal Employment Office Coordinator assigned to conduct the review reported on April 28, 2008 that he found no irregularities in the hiring process.  Id. ¶ 15; Ex. G at 1.

Second, Plaintiffs assert that they were terminated in December 2007 in retaliation for their September 2007 complaint against Mandel, and for their reporting of Mandel's inappropriate patient care and his asking of them to fraudulently document inmate files.  Goldman Decl., Ex. C, 159:10-166:18.

## B.   PROCEDURAL HISTORY

Plaintiffs filed the instant action on September 24, 2008, bringing claims for sexual discrimination, sexual harassment, and retaliation.  Plaintiffs initially named the following Defendants:  State of California; CDCR; Dr. David Mandel; Dr. David Archambault; Dr. Timothy McCarthy; Joann Van Valkenburgh; and Maureen McLean.  Dkt. 1.  On March 16, 2009, Plaintiffs dismissed the State of California as a defendant.

---

[3] Plaintiffs object, in a conclusory fashion, to paragraph 14 of the McLean Declaration on the grounds that it contains hearsay and lacks foundation.  Dkt. 121 at 5.  This objection is OVERRULED, as McLean is offering testimony regarding her own personal knowledge as a percipient witness to Cappello's hiring process.  Moreover, the Court is not receiving this testimony for the truth of the matter asserted, i.e., that Cappello was, indeed, a more qualified candidate; but rather, to shed light on the circumstances of the hiring process.

[4] Plaintiffs also object, without elaboration, to paragraph 15 of the McLean Declaration on the grounds that it contains hearsay and lacks foundation.  Plaintiffs offer no argument in support of or in clarification of their objection, and therefore this objection is OVERRULED.  Dkt. 121 at 5.

On September 4, 2009, Plaintiffs filed a First Amended Complaint against the remaining defendants, asserting six causes of action: (1) Title VII – Sexual Discrimination, Harassment and Retaliation – By Davis Against the CDCR; (2) Title VII – Retaliation – By Roy Against CDCR; (3) California Fair Employment and Housing Act ("FEHA") – Sexual Harassment – By Davis Against All Named Individual Defendants; (4) Violation of 42 U.S.C. § 1983 – Discrimination and Harassment Based on Sex, in Violation of Fourteenth Amendment Equal Protection – By Davis Against All Named Individual Defendants; (5) Violation of 42 U.S.C. § 1983 – Retaliation Against Protests and Opposition of Gender Based Discrimination and Harassment in Violation of Fourteenth Amendment Equal Protection – By Davis and Roy Against All Named Individual Defendants; and (6) State Law Whistle Blower Retaliation – Govt. Code § 8547, et seq. – By Davis and Roy Against All Named Individual Defendants. See Dkt. 48.

On September 24, 2009, Defendants filed a Motion to Dismiss Plaintiffs' FAC. Subsequently, the parties submitted, and the Court issued, a Stipulated Order granting Defendants' motion only in regard to part of Davis's FEHA (Third) Claim; thus, Davis's FEHA claim was dismissed, without leave to amend, as to all individual defendants except for Mandel. Dkt. 67.

On September 7, 2010, Defendants filed the instant Motion for Summary Judgment, or in the Alternative, Summary Adjudication. Dkt. 86. Defendants attack Plaintiffs' claims on several grounds, and each is discussed below. During briefing on Defendants' summary judgment motion, the parties submitted stipulations dismissing from this action defendants Van Valkenburgh (Dkt. 104), McLean (Dkt. 116), and Archambault (Dkt. 117). Therefore, the only remaining defendants are CDCR, Dr. Mandel, and Dr. McCarthy.

## II.   LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying

the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"  Ricci v. DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party."  Id. at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

## III.   ANALYSIS

### A.   DEFENDANTS' INDEPENDENT CONTRACTOR ARGUMENT

Defendants argue that summary judgment should be entered in their favor on Plaintiffs' Title VII claims (First and Second Claims) because "the undisputed facts establish that plaintiffs are independent contractors and not state employees."  Defs.' Mot. 12.

"One of Congress' objectives in enacting Title VII was 'to achieve equality of employment opportunities ….'"  Adcock v. Chrysler Corp., 166 F.3d 1290, 1292 (9th Cir. 1999) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 429 (1971)).  "Consequently, there must be some connection with an employment relationship for Title VII protections to apply." Id. (quoting Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir. 1980)).  "Title

VII protects employees, but does not protect independent contractors." <u>Id</u>. (citing <u>Lutcher</u>, 633 F.2d at 883; <u>Mitchell v. Frank R. Howard Memorial Hosp.</u>, 853 F.2d 762, 766 (9th Cir. 1988)).

In a Title VII action, "determining whether a relationship is one of employment or independent contractual affiliation requires a fact-specific inquiry which depends on the economic realities of the situation." <u>Id</u>. (internal quotations omitted).  "The primary factor is the extent of the employer's right to control the means and manner of the worker's performance." <u>Id</u>.  Additional factors are:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the work accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

<u>Lutcher</u>, 633 F.2d at 883 n.5.[5]

In their motion, Defendants entirely fail to address the multi-factor test set forth by the Ninth Circuit in <u>Adcock</u> and <u>Lutcher</u>, including the <u>primary factor</u> regarding the extent of the employer's right to control the means and manner of the worker's performance.  Instead, Defendants' rely only on the following allegedly "undisputed facts":  (1) Plaintiffs' work at Pelican Bay was done through a master contract that Plaintiffs' own contracting agency, Apex, entered into with CDCR; (2) Plaintiffs profited from their independent contractor relationship with CDCR, compared to their civil service colleagues, as Plaintiffs were paid commissions for contracting out their own work in addition to their contract hourly rate; and (3) Plaintiffs rejected the opportunity to work as civil service employees in favor of remaining independent contractors because of the "lucrative benefits of contractor work."  Defs.' Mot. at 12.

---

[5] "Under California law, [t]he determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences …. [But][i]f the evidence is undisputed, the question becomes one of law . . .." <u>Harris v. Vector Marketing Corp.</u>, 656 F.Supp.2d 1128, 1135 (N.D. Cal. 2009) (internal quotations omitted).

1    As an initial matter, the Court notes that the primary source of evidence that

2  Defendants' rely on for these "undisputed facts" is the Van Valkenburgh declaration.  See id. at

3  3-5.  However, after their motion was filed, Defendants filed a "Notice of Withdrawal" of Ms.

4  Van Valkenburgh's declaration because she had been dismissed as a defendant.  Dkt. 135.

5  Thus, her declaration is no longer before the Court and, therefore, is not available to support

6  the above-stated allegations.  Furthermore, Defendants have failed to identify evidence

7  demonstrating when, during their several years of employment, Plaintiffs provided contracting

8  services through Apex.  Finally, Defendants' argument that Plaintiffs rejected civic service

9  employment because it was "not as lucrative" is speculative and not supported by the limited

10  evidence which they present.

11    Defendants next argue that Plaintiffs cannot be considered "employees" under Title VII

12  because they were not hired as state civic service employees under the procedures set forth in

13  California Government Code § 18500.  However, Defendants have cited no authority in

14  support of their proposition that individuals that qualify as employees under the Luchter factors

15  must also be civil service employees to benefit from Title VII's protections.

16    In sum, Defendants' briefing on their independent contractor argument is woefully

17  inadequate, both in terms of legal analysis and evidentiary support.  On summary judgment, the

18  moving party bears the initial burden of demonstrating the absence of a triable issue of material

19  fact, which Defendants have not done.  See Indep. Towers of Wash. v. Wash., 350 F.3d 925,

20  929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion

21  and raise the issues to the court.").  Therefore, the Court denies the grant of summary judgment

22

23

24

25

26

27

28

1    on Plaintiffs' Title VII claims on the basis that Plaintiffs are not covered by Title VII.  The

2    Court next turns to Defendants' remaining challenges to Plaintiffs' claims. [6]

3        **B.    DAVIS'S FIRST CAUSE OF ACTION FOR GENDER DISCRIMINATION UNDER**

4            **TITLE VII**

5            **1.    Legal Standard**

6            Title VII provides that employers may not "discriminate against any individual with

7    respect to his compensation, terms, conditions, or privileges of employment, because of such

8    individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  A

9    plaintiff may prove unlawful discrimination by producing "direct or circumstantial evidence

10   demonstrating that a discriminatory reason more likely than not motivated the employer."

11   Metoyer v. Chassman, 504 F.3d 919, 930 (9th Cir. 2007).  If direct evidence of discrimination

12   is not available, Plaintiff may rely upon the familiar McDonnell Douglas burden-shifting

13   framework to prove discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

14   (1973); Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008).

15           The McDonnell Douglas steps include the following:  First, Plaintiff must establish a

16   prima facie case of discrimination by showing that:  (1) she belongs to a protected class; (2) she

17   was qualified for the position; (3) she was subject to an adverse employment action; and

18   (4) similarly-situated individuals outside her protected class were treated more favorably.  See

19   Surrell, 518 F.3d at 1105-1106.

20           Second, if plaintiff establishes a prima facie case of discrimination, the burden "shifts to

21   the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly

22   _____

23       [6] In their opposition, Plaintiffs argue that they should be considered employees under a
     twenty-four factor analysis provided in a publication of the State of California Employment

24   Development Department.  Plaintiffs represent that this publication is provided to State
     agencies to assist in determining the difference between an independent contractor and

25   employee.  Plaintiffs have also offered declaration testimony directed to these twenty-four
     factors.  In response, Defendants have objected to this publication and the related testimony on

26   various evidentiary grounds.  Dkt. 136.  As indicated, Defendants have failed to meet their
     initial burden on summary judgment with respect to this issue.  Therefore, the burden has not

27   shifted to Plaintiffs to show that there is a genuine issue for trial, meaning that Plaintiffs'
     proffered evidence is unnecessary.  Thus, Defendants' evidentiary objections are

28   OVERRULED as MOOT.

1   discriminatory conduct." <u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 640 (9th Cir.

2   2003).  Finally, if the employer articulates a legitimate reason for its action, "the employee

3   must then prove that the reason advanced by the employer constitutes a pretext for unlawful

4   discrimination." <u>Diaz v. Eagle Produce Ltd. Partnership</u>, 521 F.3d 1201, 1207 (9th Cir. 2008).

5   Regardless of who bears the burden of production, the employee always retains the ultimate

6   burden of persuading the trier of fact that the employer intentionally discriminated against the

7   employee.  <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1982).

8           **2.      Prima Facie Case of Discrimination**

9           With respect to the first and second <u>McDonnell Douglas</u> factors, there is no dispute that

10  Davis, as a woman, belongs to a protected class, and that she was qualified for the position she

11  <u>held</u> at the CDCR. With respect to the third factor – that Davis was subjected to an adverse

12  employment action – Davis has not clearly identified specifically what adverse employment

13  action or actions she suffered.  In their opposition brief, Plaintiffs set forth a seven-page

14  narrative of facts that is devoid of any headings and that intermingles allegations of

15  discrimination, harassment, and retaliation.  Nonetheless, in viewing the evidence in the light

16  most favorable to Plaintiffs, it appears that Davis alleges the following adverse employment

17  actions: (1) Davis was treated differently than male co-workers; (2) Mandel and Davis had

18  heated disagreements regarding Davis's clinical opinions, during which Mandel was abusive;

19  (3) Davis was not hired for the position of Psychiatric Social Worker Supervisor (in other

20  words, she was not promoted); and (4) Davis was terminated.  Each of these actions is

21  addressed below.

22           *a)       Davis's Allegations Regarding Male Co-Workers and Mandel's*

23                     *Conduct*

24           On summary judgment, Davis bears the burden of demonstrating that employees whom

25  she claims were treated more favorably were "similarly situated in all material respects."

26  <u>Moran v. Selig</u>, 447 F.3d 748, 755 (9th Cir. 2006); <u>accord</u> <u>Vasquez</u>, 349 F.3d at 641 (holding

27  "individuals are similarly situated when they have similar jobs and display similar conduct");

28  <u>Hollins v. Atlantic Co., Inc.</u>, 188 F.3d 652, 659 (6th Cir. 1999) (holding that, to be similarly

1  situated, an employee must have the same supervisor, be subject to the same standards, and

2  have engaged in the same conduct).

3      Here, other than conclusory and vague allegations, Davis has failed to set forth any

4  specific facts showing that she was treated differently from other similarly situated male

5  workers at CDCR by Mandel or any other CDCR manager.  In particular, Davis speculates,

6  without providing any supporting evidence, that she "was treated differently" than "males in

7  her work area," and that Mandel moved her computer from her workspace, which "did not

8  happen to male co-workers in the office."  Davis Decl. ¶¶ 41, 43.  Fundamentally, Davis does

9  not offer any evidence indicating that those male "co-workers" were similarly situated, in terms

10 of having the same job title, having the same supervisor, and being subject to the same

11 standards as Davis.  As such, Davis has not met the fourth element of the <u>McDonnell Douglas</u>

12 test with respect to these allegations.

13     Furthermore, Davis alleges that Mandel had remarked that "women were not suited to

14 work at Pelican Bay."  Davis Decl. ¶ 6.  However, Davis presents no evidence that Mandel's

15 remark was connected to any adverse employment action, and therefore the remark does not

16 establish gender discrimination.  <u>See e.g.</u> <u>Merrick v. Farmers Ins. Grp</u>., 892 F.2d 1434, 1438

17 (9th Cir. 1990) (<u>citing</u> <u>Smith v. Firestone Tire and Rubber Co</u>., 875 F.2d 1325, 1330 (7th Cir.

18 1989) (noting that stray "remarks, ... when unrelated to the decisional process, are insufficient

19 to demonstrate that the employer relied on illegitimate criteria, even when such statements are

20 made by the decisionmaker in issue")).

21     Davis also complains that Mandel raised his voice to her during their workplace

22 disagreements, allegedly shook her on one occasion, and made crude jokes.  Defendants

23 concede that Davis has "offered conclusions that would support an observation that Mandel's

24 behavior violated a civility code."  Defs.' Reply at 6.  However, as correctly noted by

25 Defendants, while Mandel's conduct may be deemed boorish and inappropriate (the CDCR

26 removed him as Davis's supervisor pursuant to her request), those allegations do not establish a

27 gender-discrimination claim in violation of Title VII.  Title VII is not intended to be a general

28 civility code for the workplace.  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)

1   ("standards for judging hostility are sufficiently demanding to ensure that Title VII does not

2   become a general civility code. … Properly applied, they will filter out complaints attacking

3   the ordinary tribulations of the workplace, such as the sporadic use of abusive language,

4   gender-related jokes, and occasional teasing.") (internal quotations and citation omitted); see

5   also Baskerville v. Culligan Internat. Co., 50 F.3d 428, 430 (1995) (anti-discrimination laws

6   are "not designed to purge the workplace of vulgarity").

7        Furthermore, the record presented supports Defendants' characterization of Mandel as

8   an "equal opportunity boor." Defs.' Reply at 6. Indeed, as the Supreme Court has explained,

9   the concern under Title VII is "whether members of one sex are exposed to disadvantageous

10  terms or conditions of employment to which members of the other sex are not exposed."

11  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (emphasis added). Here, in

12  her September 29, 2007 letter to McCarthy requesting that Mandel be removed as her

13  supervisor, Davis characterizes Mandel as "conducting himself like a schoolyard bully, picking

14  on whoever appears weak and vulnerable. This has included verbally agitating inmates, openly

15  attacking staff both custody and mental health in meetings, including in front of inmates. He

16  has no mercy on persons he chooses to berate." Chen Decl., Ex. B4 at 00663. Later, in a

17  December 27, 2007 letter to the State Personnel Board, three months after being removed from

18  Mandel's supervision, Davis reported Mandel's "accumulating abuses toward staff members,

19  other patients, and me…" Id. at 00657. In another passage, Roy describes Mandel

20  "…confronting Dr. Bob Sayer in a demeaning way on 'the absurdity of his presentation.'" Roy

21  Decl. at 8.

22       In view of this evidence, Davis has failed to make out a prima facie case based on these

23  allegations. She has failed to show that she was exposed to disadvantageous terms or

24  conditions of employment to which males in her position were not exposed. The Court next

25  considers Davis's allegations regarding failure to promote and discriminatory termination.

26              *b)*      ***Failure to Promote and Discriminatory Termination***

27       To support a prima facie claim of discriminatory promotion, the plaintiff must show: "1.

28  [s]he is a member of a class protected by Title VII; 2. [s]he was qualified for the position

1  sought; 3. [s]he was denied the promotion; and 4. individuals outside of the protected class

2  were promoted." <u>Pejic v. Hughes Helicopters, Inc.</u>, 840 F.2d 667, 672 (9th Cir. 1988).  Here,

3  Davis alleges that she was passed over for the supervisor position in favor of a less-qualified

4  male colleague.  Defendants do not argue that Davis was not qualified for the position; rather,

5  they argue that she was not chosen in favor of a more qualified candidate.  Given that

6  Defendants do not dispute any of the four required elements, Davis has made a prima facie

7  showing with respect to this claim.

8      To support a prima facie claim of discriminatory discharge, the plaintiff must show: "1.

9  [s]he was within the protected class; 2. [s]he was performing [her] job well enough to rule out

10  the possibility that [s]he was fired for inadequate job performance; and 3. [her] employer

11  sought a replacement with qualifications similar to [her] own, thus demonstrating a continued

12  need for the same services and skills." <u>Id.</u> at 672.  Here, Defendants do not argue that Davis

13  was fired for inadequate job performance.  However, it is not apparent from the record whether

14  Defendants sought a replacements with qualifications similar to Davis's.  Defendants have

15  represented that Davis's services were terminated due to the receiver's mandate to hire civil

16  service workers in place of contractors.  Thus, the Court finds that Davis has minimally made a

17  prima facie showing here.

18      In sum, Davis has set forth a prima facie case of discrimination with respect to these

19  employment actions.  As such, the next inquiry is whether Defendants had a legitimate, non-

20  discriminatory reason for taking these actions.

21          **3.      Legitimate, Non-Discriminatory Reasons Motivating Defendants'**

22                  **Hiring Decision and Plaintiffs' Terminations**

23      As indicated, Davis alleges that discriminatory animus motivated Defendants' hiring

24  decision regarding the Psychiatric Social Worker Supervisor position and Davis's termination.

25  However, Defendants have offered evidence sufficient to show that they were motivated by

26  legitimate, nondiscriminatory reasons in making those employment decisions.

27      Specifically, with respect to the supervisor position, Defendants have offered evidence

28  that both Davis and Roy were not selected for the position because the interview panel

unanimously determined that they were not the best candidates for the position.  Moreover, it is undisputed that two members of the panel, both of whom are women, had no apparent or alleged motive to discriminate against either Davis or Roy.  See McLean Decl., Ex. F. Tellingly, they have not been named as defendants in this action.

As for Davis's termination, the evidence shows that Defendants ended their contracts with Plaintiffs due to the federal receiver mandates, which compelled the CDCR to minimize and eventually eliminate its hiring of contractors.  The evidence also shows that Davis and Roy were provided advanced warning of the risk that their contract work would be terminated.

Thus, the evidence establishes that Defendants made the employment decisions at issue for legitimate, non-discriminatory reasons.  The Court next turns to Plaintiffs' allegations regarding pretext.

### 4.    Pretext

Where the employer presents legitimate reasons for the challenged action, "the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual."  Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 849 (9th Cir. 2004).  Evidence to show pretext must be both specific and substantial in order to overcome the articulated legitimate reasons put forth by the employer.  See Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 (9th Cir. 2006).

Here, Plaintiffs have presented no such evidence.  Rather, Roy testified that, based on his observations, Mandel was "best friends" with Archambault, who was one of the three members the interview panel.  Chen Decl., Ex. E at 100:3-11.  However, other than mere speculation, Plaintiffs have offered no evidence demonstrating or suggesting that Mandel exerted any influence over Archambault's hiring decision, or over the hiring decisions of the two other members of the panel.  Moreover, while Davis opines that she had more experience and training than the hired candidate, her unsupported and non-specific opinion is insufficient as a matter of law.  See Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983) (affirming summary judgment for employer where the plaintiff "produced no facts which, if believed, would have shown pretext and thus tendered an issue for trial."); see also Surrell, 518 F.3d at

1103 ("Conclusory statements without factual support are insufficient to defeat a motion for summary judgment.").  Finally, Davis fails to offer any, much less specific and substantial, evidence to overcome Defendants' assertion that her position was terminated due to the federal receiver's mandates.

At bottom, Davis offers nothing more than factually-barren, conclusory statements that she was the victim of discrimination.  The Court concludes that Davis has failed to demonstrate the existence of any genuine issues of material fact, and therefore, grants summary judgment in favor of Defendants on Davis's First Cause of Action for gender discrimination.

### C.   DAVIS'S FIRST AND THIRD CAUSES OF ACTION FOR SEXUAL HARASSMENT UNDER TITLE VII AND FEHA, RESPECTIVELY

To prevail on a hostile workplace claim under either Title VII or FEHA, a plaintiff must show:  (1) that she was subjected to verbal or physical conduct of a discriminatory nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  See Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995); Beyda v. City of Los Angeles, 65 Cal.App.4th 511, 517 (1998) (holding that FEHA claims are to be considered consistent with federal cases interpreting Title VII).

The work environment must be perceived as abusive both subjectively and objectively. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  In determining whether conduct was sufficiently severe or pervasive, the court examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. (internal citations and quotations omitted).

In the instant case, Davis has failed to establish that much of the conduct that she alleges to have experienced was "verbal or physical conduct of a discriminatory nature," so as to satisfy the first factor.  As indicated above, Mandel's alleged abuse of colleagues, including Davis, was not because of gender, but rather was apparently attributable to his overbearing

1  manner, or, as Davis puts it, to Mandel "picking on whoever appears weak and vulnerable."

2  For that reason alone, Davis has failed to support her hostile work environment claim.

3       Additionally, Davis has not demonstrated that the conduct at issue was sufficiently

4  pervasive and severe.  According to Davis, the "hostile work environment" she experienced

5  resulted from Dr. Todd Roy's timing of her visits to the restroom, the CDCR exposing her to

6  scenes of male inmates masturbating, Mandel's "grilling" of her regarding her experience with

7  an inmate that exposed his penis, Mandel's shaking of her, and Mandel's isolated jokes about

8  his wife.  Of note, these incidents are alleged to have occurred over a seven year period.

9       Mandel's alleged comments fall short of the type and frequency of conduct required to

10  demonstrate a hostile work environment.  For example, in Nichols v. Azteca Restaurant

11  Enterprises, Inc., 256 F.3d 864 (9th Cir. 2001), the Ninth Circuit held that the plaintiff was

12  subjected to an objectively hostile work environment where he was subjected to an

13  "unrelenting barrage of verbal abuse…."  Id. at 872.  Plaintiff's co-workers and supervisor

14  referred to Plaintiff in Spanish and English as "she" and "her" and mocked him for carrying his

15  serving tray "like a woman."  Id.  He also was subjected to name-calling in both English and

16  Spanish with epithets such as "faggot" and "fucking female whore."  Id. at 870.  This abuse

17  occurred at least once a week and often several times a day.  Id.  Based on the record presented,

18  the court held that the conduct directed at plaintiff was designed to humiliate and anger him,

19  and was sufficiently severe and pervasive to alter the terms and conditions of his employment.

20  Id. at 873.

21       In contrast, the Ninth Circuit has rejected hostile work environment claims involving

22  circumstances far more severe and pervasive than those claimed by Davis.  See Sanchez v. City

23  of Santa Ana, 936 F.2d 1027, 1031, 1037 (9th Cir. 1990) (affirming conclusion that plaintiffs

24  failed to prove a hostile work environment even where the employer allegedly made racially

25  offensive slurs, kept illegal personnel files on the plaintiffs because they were Latinos,

26  provided unsafe vehicles to Latino police officers, posted a racially offensive cartoon, targeted

27  Latinos when enforcing rules, and did not provide adequate back-up to Latino police officers);

28  Vasquez, 349 F.3d at 643-44 (finding no hostile environment even where plaintiff was told that

1   he should consider transferring to work in the field because "Hispanics do good in the field,"

2   was told that he had "a typical Hispanic macho attitude," a co-worker made continual, false

3   complaints about the plaintiff to his supervisor, and plaintiff was yelled at in front of others);

4   Manatt v. Bank of Am., 339 F.3d 792, 798 (9th Cir. 2003) (finding that jokes using the phrase

5   "China man," ridiculing plaintiff for mispronunciation of names, and employees pulling their

6   eyes back with their fingers to mock the appearance of Asians did not constitute a hostile work

7   environment for a Chinese woman).

8       Moreover, it appearing that Mandel made isolated comments of a sexual nature, no

9   reasonable jury could find that they were sufficiently severe or pervasive to alter the conditions

10  of Davis's employment and thus create a hostile work environment.  At most, Davis has shown

11  stray and/or sporadic comments that, as the above-discussed legal authorities confirm, are

12  legally insufficient to constitute an impermissible, hostile work environment.  See also

13  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1284-85 (9th Cir. 2000) (employer's statement

14  that plaintiff was not "young and promotable" insufficient to overcome summary judgment);

15  Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438-39 (9th Cir.1990) (hiring supervisor's

16  statement that he replaced plaintiff with younger worker because he was a "bright, intelligent,

17  knowledgeable young man" insufficient to overcome summary judgment).

18      In her opposition, Davis generally refers to Plaintiffs' declarations and deposition

19  testimony, and argues that "Defendants make very little formal showing to prove that plaintiff

20  was not subject to a hostile environment because she was female."  Plfs.' Opp. at 18.

21  However, in a Title VII action, the employee always retains the ultimate burden of persuasion,

22  which she has not met.  Burdine, 450 U.S. at 253.

23      The Court therefore grants Defendants' motion for summary judgment as to Davis's

24  First and Third Causes of Action for sexual harassment.

25      **D.    PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION FOR RETALIATION**

26          **UNDER TITLE VII**

27  "The elements of a prima facie retaliation claim are, (1) the employee engaged in a

28  protected activity, (2) she suffered an adverse employment action, and (3) there was a causal

1    link between the protected activity and the adverse employment action."   Davis v. Team Elec.

2    Co., 520 F.3d 1080, 1093-94 (9th Cir. 2008).

3         "The term 'protected activity' refers to action taken to protest or oppose statutorily

4    prohibited discrimination."   Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)

5    (citing 42 U.S.C. § 2000e-3).  An adverse employment action is one that is "reasonably likely

6    to deter employees from engaging in protected activity."   Ray v. Henderson, 217 F.3d 1234,

7    1243 (9th Cir. 2000).

8         "That an employer's actions were caused by an employee's engagement in protected

9    activities may be inferred from proximity in time between the protected action and the

10   allegedly retaliatory employment decision."   Raad v. Fairbanks North Star Borough School

11   Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).  There is no bright-line test regarding the temporal

12   proximity between the protected activity and the adverse employment action.  See Allen v.

13   Iranon, 283 F.3d 1070, 1078 (9th Cir. 2002) ("Although an inference from temporal proximity

14   would have been stronger had the gap in time been smaller, an eleven-month gap in time is

15   within the range that has been found to support an inference that an employment decision was

16   retaliatory.").  If the plaintiff is able to present a prima facie case of retaliation, the burden then

17   "shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision."

18   Ray, 217 F.3d at 1240.  If the defendant presents evidence of a non-discriminatory motive, the

19   burden shifts back to the plaintiff to show that such explanation is a pretext for retaliation.  See

20   Surrell, 518 F.3d at 1108.

21        Here, Plaintiffs allege that, as a result of their complaints against Mandel, they were

22   passed over for the Psychiatric Social Worker Supervisor and later terminated.  Plaintiffs offer

23   no evidence to support their retaliation claim other than temporal proximity, i.e., Plaintiffs

24   allege they complained of Mandel's behavior on September 27, 2007, they unsuccessfully

25   interviewed for the supervisor position on September 28, 2007, and they were terminated on

26   December 20, 2007.

27        Although the timing of these events may suffice to establish a minimal prima facie case

28   of retaliation, it does nothing to refute Defendants' proffered legitimate reasons for their

1  employment decisions, discussed above in the context of Davis's discrimination claim.  <u>See</u>
2  <u>Hashimoto v. Dalton</u>, 118 F.3d 671, 680 (9th Cir. 1997) (although the temporal proximity of an
3  adverse employment action to an employee's protected behavior may suffice to support a
4  "minimal prima facie case of retaliation," where such timing "does nothing to refute the ...
5  proffered legitimate reasons for" the employment action, evidence of such temporal proximity
6  is insufficient to carry the plaintiffs burden "of establishing a triable issue of fact on the
7  ultimate question" of retaliation).

8       Because Plaintiffs have offered nothing more in response to Defendants' evidence of
9  legitimate motive, the Court grants Defendants' motion for summary judgment as to Plaintiffs'
10  First and Second Causes of Action for retaliation.

11       **E.    DAVIS'S FOURTH CAUSE OF ACTION FOR EQUAL PROTECTION VIOLATIONS**
12            **BASED ON SEX**

13       In her fourth cause of action, Davis contends that the same actions constituting statutory
14  discrimination and harassment also constitute constitutional deprivations of equal protection,
15  entitling her to recover under 42 U.S.C. § 1983 against the individual defendants.  Under the
16  <u>McDonnell Douglas</u> (discrimination) and harassment analyses set forth above, Davis's § 1983
17  claim fails for the same reasons as her Title VII and FEHA claims.  <u>See</u> <u>St. Mary Honor Center</u>
18  <u>v. Hicks</u>, 509 U.S. 502, 506 n. 1 (1993) (finding the <u>McDonnell Douglas</u> framework applicable
19  to discrimination claims under § 1983); <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 744-45 (2d
20  Cir. 2003) (noting that § 1983 sexual harassment claim was "governed by traditional Title VII
21  'hostile environment' jurisprudence" and considering frequency and severity of alleged
22  misconduct).  Davis has offered no additional argument to the contrary in the context of her §
23  1983 claim.  As such, the Court grants Defendants' motion for summary judgment as to
24  Davis's Fourth Cause of Action.

25
26
27
28

1
2

**F.      PLAINTIFFS' FIFTH CAUSE OF ACTION FOR EQUAL PROTECTION VIOLATION/SPEECH RETALIATION**

3
4
5

Plaintiffs bring their Fifth Cause of Action under § 1983, alleging that they suffered retaliation at the hands of the individual defendants after complaining about the discrimination and harassment suffered by Davis.  FAC, ¶¶ 73-74.

6
7
8
9
10
11
12
13

A "sequential five-step series" of questions is used to determine if there has been impermissible retaliation based on speech: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the [plaintiff] employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech."  Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).

14
15
16
17
18
19
20
21
22
23
24
25

With respect to the first question, courts have recognized that "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern."  Id. (internal quotations omitted); see also Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993) (speech retaliation claim based on individual sex harassment is not a matter of public concern); Phelan v. Cook County, 463 F.3d 773, 791 (7th Cir. 2006) (complaint of personal sex harassment, even if also intended to vindicate the rights of another woman, are not matters of public concern for purposes of section 1983 speech-retaliation claim).  Likewise, complaints of personal mistreatment by supervisors are not actionable matters of public concern.  See Wicks v. Mississippi State Employment Services, 41 F.3d 991, 995-96 (5th Cir. 1995) (complaints of improper discipline by supervisor and improper denial of promotion not matters of public concern).

26
27
28

Here, in view of the authority holding that personal complaints are not actionable, Plaintiffs have not established, based on the evidence presented, that their complaints alleging harassment and discrimination of Davis are a matter of public concern and thus actionable

1  under § 1983.  Moreover, in their opposition, Plaintiffs entirely fail to address the decisional

2  authority cited by Defendants and discussed herein, and have failed to cite any authority

3  supporting their argument to the contrary.

4         Therefore, summary judgment is granted as to Plaintiffs' Fifth Cause of Action.

5  **G.   PLAINTIFFS' SIXTH CAUSE OF ACTION FOR STATE LAW WHISTLEBLOWER**

6  **RETALIATION UNDER CALIFORNIA GOVERNMENT CODE § 8547, ET SEQ.**

7         In their initial complaint, Plaintiffs asserted that this Court has subject matter

8  jurisdiction over their federal discrimination, harassment, and retaliation claims, and also has

9  supplemental jurisdiction over their state law whistleblower claim.  See Complaint, ¶ 1.[7]  As

10 indicated, the Court has determined that summary judgment in Defendants' favor as to each of

11 Plaintiffs' federal claims is appropriate.  Title 28 of the United States Code, § 1367(c)(3)

12 provides that "the district courts may decline to exercise supplemental jurisdiction over a claim

13 … if …the district court has dismissed all claims over which it has original jurisdiction …."

14 As explained by the Ninth Circuit, a "federal district court with power to hear state law claims

15 has discretion to keep, or to decline to keep, them under the conditions set out in [28 U.S.C.] §

16 1367(c) … the district court's discretion should be informed by the [] values of economy,

17 fairness, and comity."  Munger v. City of Glasgow Police Dept., 227 F.3d 1082, 1089 (9th Cir.

18 2000) (internal quotations omitted); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343,

19 350 n. 7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial,

20 the balance of the factors to be considered under the pendent jurisdiction doctrine – judicial

21 economy, convenience, fairness, and comity – will point toward declining to exercise

22 jurisdiction over the remaining state-law claims."); Trustees of Constr. Indus. and Laborers

23 Health and Welfare Trust v. Desert Valley Landscape & Maint., Inc., 333 F.3d 923, 926 (9th

24 Cir. 2003) (noting "our cases upholding the exercise of discretion under § 1367(c)(3) have all

25 involved dismissals for failure to state a claim or a grant of summary judgment to the defendant

26 on the federal claim").

27

28

---

[7] Plaintiffs did not allege diversity jurisdiction.

1    In the instant case, the values of economy, fairness, and comity favor dismissal, without

2    prejudice, of Plaintiffs' state law whistleblower claim.  Specifically, the Court notes that the

3    state law administrative proceeding on Plaintiffs' whistleblower claim, initiated by Plaintiffs

4    before the State Personnel Board, is still pending and is currently scheduled for hearing on

5    March 7-11, 2011.  Dkt. 109 at 2.  This factor weighs in favor of this Court relinquishing

6    jurisdiction over the whistleblower claim.  See e.g., Notrica v. Board of Sup'rs of County of

7    San Diego, 925 F.2d 1211, 1215 (9th Cir. 1991) (finding that, once a plaintiff initiates multiple

8    litigation by filing his state claims in both state and federal courts, it is not an abuse of

9    discretion for the federal court to decline to retain jurisdiction over state law claims after

10   dismissing federal claims).  Moreover, Plaintiffs' whistleblower claim, based on the California

11   Government Code, is based entirely on state law issues, and the remedy Plaintiffs seek under

12   their claim arises under the Code.  See FAC at 15; see e.g., Carnegie-Mellon University v.

13   Cohill, 484 U.S. 343, 350 (1988) (factors "usually will favor a decision to relinquish

14   jurisdiction when state issues substantially predominate, whether in terms of proof, of the scope

15   of the issues raised, or of the comprehensiveness of the remedy sought.") (internal quotations

16   omitted).

17   In view of these factors, the Court declines to exercise supplemental jurisdiction over

18   Plaintiffs' Sixth Cause of Action, and that claim is ordered dismissed, without prejudice.[8]

19   **IV.    CONCLUSION**

20   For the above stated reasons,

21   IT IS HEREBY ORDERED THAT:

22   1.    Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' First,

23   Second, Third, Fourth, and Fifth Causes of Action.

---

[8] While Defendants have moved for summary judgment on Plaintiffs' whistleblower claim on various grounds, the Court has not reached the merits of those issues, in view of its determination not to exercise supplemental jurisdiction over the claim.  As a final matter, Defendants have made several evidentiary objections to Plaintiffs' declarations.  Dkts. 132, 134.  Even taking Plaintiffs' allegations as true, and viewing their evidence in the light most favorable to them as the non-moving party, as the Court has done here, Plaintiffs have still failed to raise any genuine issue of material fact in support of their claims.  Therefore, Defendants' evidentiary objections are DENIED as MOOT.

1    2.    The Court declines to exercise supplemental jurisdiction over Plaintiffs' Sixth

2  Cause of Action, and that cause of action is DISMISSED, without prejudice.  Defendants'

3  Motion for Summary Judgment is DENIED as MOOT as to Plaintiffs' Sixth Cause of Action,

4  on the ground that the Court has declined to exercise supplemental jurisdiction over that cause

5  of action.

6         IT IS SO ORDERED.

7  Dated: November 24, 2010                          _____
                                                     SAUNDRA BROWN ARMSTRONG
8                                                    United States District Judge